1

2   Ryan J. Cann, Esq.
   Nevada Bar No. 11073
3   CANN IP LAW PLLC
   1 East Liberty Street, Suite 600
4   Reno, Nevada 89501
   775-234-3796  Telephone
5   info@canniplaw.com   Email
   Attorney for Plaintiff
6

7

8                    **UNITED STATES DISTRICT COURT**
                        **DISTRICT OF NEVADA**
9

10

11  FEI FEI FAN,                                    Case No.:   3:22-cv-00560-RCJ-CLB

12                          Plaintiff,
   vs.                                             **FIRST AMENDED COMPLAINT**
13
   STATE OF NEVADA EX REL. BOARD OF                **DEMAND FOR JURY TRIAL**
14  REGENTS OF THE NEVADA SYSTEM OF
   HIGHER EDUCATION, ON BEHALF OF
15  THE UNIVERSITY OF NEVADA, RENO

16                          Defendant.

17

18

19          Plaintiff FEI FEI FAN ("Fan") by and through her undersigned attorney, hereby alleges

20  as follows:

21                            **NATURE OF THE ACTION**

22          1.      For over a decade, the University of Nevada, Reno ("UNR") has knowingly permitted

23  and ratified senior leadership in its Mechanical Engineering (ME) department to pervasively abuse,

24  intimidate, deter, silence, dismiss, and retaliate against foreign students and junior faculty. UNR has

25  knowingly taken advantage of these foreign students and junior faculty vulnerabilities, including

26  temporary legality to stay in the U.S., reliance of livelihood on student stipends, reliance of schooling

27  and employment prospects on individual advisors or ME senior leadership, lack of knowledge of U.S.

28  law, lack of financial independence to seek legal counsel, lack of ability to advocate for themselves,
   lack of English proficiency, and cultural barriers.

2.      UNR has knowingly permitted its well-funded and powerful senior professors, including a serial sexual predator and violent rapist Yan Yao Jiang ("Jiang"), to turn a higher education workplace into a hostile environment with underground sex slavery and flagrant involuntary servitude. For years, Jiang used his power in the ME department to sexually exploit vulnerable students and faculty: Jiang sexually assaulted female students without their consent and threatened to sabotage students' careers if they displeased him. UNR allowed and facilitated Jiang to traffic Fan from China to Reno, Nevada in 2006 and from the State of Georgia to Reno, Nevada in 2015 for years-long inhuman sex slavery. UNR's continuing systemic failures ensured that Fan experienced years-long workplace exploitation, was vulnerable to sex slavery and involuntary servitude, and in fact did experience sex slavery and involuntary servitude.

3.      After Fan reported the years-long sexual exploitation perpetrated by Jiang with UNR, UNR failed to act. UNR intentionally made no visible progress on the Title IX investigation against Jiang by willfully ignoring the overwhelming evidence and declining to interview witnesses and victims. UNR took no disciplinary action to prevent Jiang from having access to female students and junior faculty in a leadership position, despite knowing that Fan was sexually slaved, deterred, and retaliated against by Jiang. UNR knowingly benefited from its cycle of institutional betrayal by protecting its own reputation and collecting money through student enrollment, sponsorships, and grants, and for Jiang's accomplishments and prestige, for Jiang's recruitment and training of other students and mentees.

4.      Plaintiff, by and through her undersigned counsel, brings this civil action against UNR under the federal Trafficking Victims Protection Reauthorization Act ("TVPRA"), Title IX, Title VI, Nevada law, and common law.

**JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the statutory claims under the TVPRA, Title IX, and Title VI present a federal question.

6.      This Court has supplemental jurisdiction over the related state-law claims under 28 U.S.C. § 1367. Supplemental jurisdiction over those claims exists because they arise from the same common nucleus of operative facts from which the federal claims arise.

7.      This Court is the proper venue under 28 U.S.C. § 1391 (b) because UNR is located in this District and because Plaintiff was located in this District during much of the events described in

this complaint and resided in this District a recent relocation, and the events giving rise to these claims occurred in this District.

## **PARTIES**

8.     Plaintiff Fei Fei Fan, 38 is a Chinese citizen. Fan became a U.S. permanent resident in 2020 May. At all times material hereto, Fan was single and had no family members in the United States.

9.     From 2006 to 2008, Fan studied for her M.S. degree and worked as a graduate student employee in the ME department at UNR in Reno, Nevada on an F-1 student visa.

10.     From 2015 to 2021, Fan worked as tenure-track Assistant Professor in the ME department at UNR in Reno, Nevada. Fan was on an F-1 student visa and later on an H-1B work visa until 2020 May, when Fan obtained a ten-year employment-based EB-1A visa.

11.     Defendant State of Nevada ex rel. Board of Regents of the Nevada System of Higher Education, on behalf of the University of Nevada, Reno is a public educational institution located in Reno, Nevada. It is governed by  the Nevada System of Higher Education (NSHE), and therefore the NSHE is responsible for all actions of UNR throughout the entirety of the relevant actions detailed herein. Throughout this complaint, all references to UNR should be read as also being references to Defendant, unless otherwise stated.

12.     At all times relevant to this action, UNR through the Nevada System of Higher Education has received, and continues to receive, federal funding and financial assistance within the meaning of 20 U.S.C. § 1681(a) and is otherwise subject to Title IX and Title VI.

## **FACTUAL ALLEGATIONS**

***A. Background: UNR knew and ratified longstanding systemic failures in its ME department.***

   *A1. UNR prioritized financial benefits over learning and work environment.*

13.     UNR is Nevada's flagship public university and primary land grant research university. Like many higher education institutions, UNR relies on its faculty's accomplishments and prestige to entice student enrollment for monetary and other benefits, to obtain research funding, and to increase its reputation and standing within the academic world.

14.     For over a decade, UNR created and knowingly permitted senior leadership in the ME department to establish, perpetrate, and foster a hostile learning and work environment. UNR financial

benefited from this senior leadership, despite this senior leadership's continued bad actions as detailed herein, and immunized the senior faculty who sustained the financial benefits at the expense of its foreign graduate students and junior faculty.

15.     The failure of ME senior leadership caused faculty members leave from UNR as the abusive culture became unbearable. Through information and believe, by 2016, all tenured and tenure-track faculty who were hired by the department from 1997 to 2012 left UNR. They either abandoned their careers in academia or irrevocably derailed their career paths.

16.     When Fan was recruited as a tenure-track Assistant Professor at UNR in 2015, the ME department had only five already-tenured faculty members: three Full Professors (including the then-Department Chair) and two Associate Professors. They all worked in the department for twenty years or more; they were allies of one another; they were powerful and influential within UNR through a sprawling professional network. These five tenured professors constituted the ME senior leadership that held complete authority over the department. They evaluated, rated, and voted on the tenure-or-not of tenure-track faculty, and had power to discipline and dismiss tenure-track faculty.

17.     The ME senior leadership created a long-standing toxic atmosphere for graduate student employees and tenure-track faculty. UNR knew and permitted the toxic atmosphere and allowed tenured professors to pervasively abuse, intimidate, deter, silence, and dismiss student employees and tenure-track faculty, who had vulnerabilities in legality to stay in the U.S., dependence of livelihood on student stipends, reliance of schooling and employment prospects on a single advisor or the ME senior leadership.

18.     In 2016, UNR allowed one of the three Full Professors, Faramarz Gordaninejad ("Gordaninejad"), to retire suddenly. Since a decade before his retirement, Gordaninejad leveraged his position and power within UNR to exploit his foreign graduate students on F-1 visas, not American graduate students, to provide free skilled labor at his private company for his private benefit. Gordaninejad's company was an applicant and participant in government-funded projects, in which Gordaninejad served as the Industrial Principal Investigator (PI) and his postdoc students (working under his powerful leadership) served as the intermediary PI for UNR. Through such "collaboration" between his company and his research group at UNR, both the company and UNR received financial supports from federal and state funding agencies. UNR high-level administrators knew about Gordaninejad's exploitative practices and deliberate means of obtaining funding but well enjoyed this business model. For the purpose of financially benefiting from such "collaboration," UNR, for years,

intentionally failed in meeting its obligation of protecting its foreign graduate students by participating in and facilitating forced labor, labor trafficking, national origin discrimination, fraudulent misrepresentation, wage and hour violations.

19.     Upon information and belief, a couple of years before Gordaninejad's sudden retirement, UNR received formal complaints against Gordaninejad regarding national origin discrimination, gender discrimination, and retaliation on Iranian and Chinese female graduate students.

20.     Upon information and belief, UNR did not disclose the existence of a years-long Title IX investigation against Gordaninejad regarding gender discrimination, race discrimination, and retaliation. UNR did not disclose whether the sudden retirement was intentionally made to unilaterally stop the investigation or to avoid disciplinary action.

21.     To date, UNR still accepted donation from Gordaninejad. Every year after Gordaninejad retired, the ME department officially organized academic activities among faculty and students to memorize Gordaninejad's wife, indicating his influence within UNR even though he was retired.

22.     After Gordaninejad retired in 2016, the ME department then had only four tenured faculty members. These four tenured faculty members constituted the ME senior leadership. From 2016 to 2020, seven more tenure-track Assistant Professors left the department, which is not common considering the size of tenured and tenure-track faculty body in the ME department remained only around a dozen.

23.     In 2018, an ME tenure-track Assistant Professor who raised concerns on the power-based toxic culture and hostile work environment within the ME department to the Dean of College of Engineering, Manos Maragakis ("Maragakis"), was suddenly dismissed, almost immediately upon the request of the then-Department Chair, Miles Greiner ("Greiner"), although allegations against this Assistant Professor were recanted and made by no witnesses (or by witnesses under duress, upon information and belief). ME tenure-track faculty then concerned about whether this dismissal related to the Fourteenth Amendment's Denial of Procedural Due Process and harmful procedure violations, and whether UNR, a state actor acting under color of state law, violated Title VI National Origin Discrimination and the First Amendment's Deterrence and Retaliation against free speech.

24.     Shortly after the dismissal, ME tenure-track faculty signed a petition letter and trusted one of the two tenured Associated Professors in the ME Department, Eric Wang ("Wang"), to submit

the letter to UNR high-level administrators with supervisory authority. Rather than submitted the letter as promised, Wang instead ripped off the letter, without notifying the tenure-track faculty who signed the letter. ME senior leadership and UNR administrators with supervisory authority knew about Wang's such behavior, but intentionally failed to investigate it or respond with appropriate corrective action. This further institutional betrayal again deterred and silenced ME tenure-track faculty by confirming that UNR ratified, facilitated, and engaged in systemic discrimination, deterrence and retaliation against free speech, and hostile work environment.

25.     UNR's high-level administrators completely knew about the ME senior leadership's intentional failure to retain tenure-track faculty; however, they were complicit in this failure, as a scheme, to shield UNR from legal judgment and to conceal UNR's continuation of long-range unlawful conduct. Litigating against a university could end the academic careers of tenure-track faculty because it could lead to a denial of tenure and grant applications, even though they might temporarily get tenure-track positions in other universities. UNR and the ME senior leadership knowingly took advantage that tenure-track faculty would not speak up in fear of fatal damages to their careers, and thus felt immune. By means of such a scheme, UNR financially benefited from the decades-long deterrent and retaliatory culture within its ME department, through protecting its own reputation to entice student enrollment for monetary benefits and immunizing its well-funded senior faculty for continuous grants.

*A2. UNR failed to train and supervise students and faculty regarding unlawful abuse.*

26.     For over a decade in the ME department, the majority of graduate student employees were foreign students on F-1 visas; the majority of tenure-track faculty were foreign employees on F-1, H-1B, and EB-1 visas. H-1B visa holders must leave the U.S. immediately when their employment ends. F-1 visa holders must leave the U.S. within 60 days after their program and employment ends.

27.     These foreign employees were more vulnerable than their American counterparts. They relied on their thesis advisors or the ME senior leadership to maintain visa status and legally stay in the U.S., to maintain student stipends as the only lawful livelihood, to continue education and employment. They lacked knowledge of American laws and human rights, financial independence to seek legal counsel when facing legal threats from abusers, the ability to advocate for themselves, English proficiency, and knowledge of American cultural practices.

28.     Knowing these vulnerabilities, UNR never provided training to foreign graduate student employees in the ME department on Title IX, Title VI, Title VII, and relevant policies to

prevent abuse and unlawful exploitation by their advisors and supervisors. UNR did not provide them with a clear reporting channel. As a consequence, foreign graduate student employees were not aware of their rights and how to report. When they wanted to report incidents of abuse or assault by advisors and supervisors up the chain of command, but were in fear of retaliation, they did not even know the existence of the Title IX office, and they often went to the Graduate School, the Office of International Students and Scholars, and the Vice Provost Office to make verbal complaints, and their complaints were thus not properly handled. In addition, foreign graduate student employees had more difficulties than their American counterparts in identifying workplace abusive and exploitative behavior, because in their own countries being verbally, physically, and sexually abused by teachers and advisors and running personal errands for advisors were not uncommon and no related statutes or policies existed. Further, reporting rapes, especially perpetrated by married male seniors, was extremely stigmatized across east Asian cultures.

29.    UNR failed to properly train and supervise its faculty on Title IX, Title VI, and Title VII policies. UNR provided only superficial online training that contains animation and multiple choice questions to its faculty. UNR requested its faculty to take the training every few years. The training did not instill confidence in possibility that UNR would protect vulnerable victims from powerful perpetrators up the chain command. The training did not instill specific knowledge of reporting procedures that minimize deterrence and retaliation against vulnerable groups.

30.    As a consequence of UNR's decades-long and ongoing failure in training and supervision, UNR, together with its powerful and well-funded senior faculty, took advantage of vulnerabilities of foreign students and tenure-track faculty to benefit itself. In particular, some faculty members routinely summoned individual foreign female student employees to office after midnight with the door closed; some faculty members exploited foreign students' labor for their personal profits through leveraging their positions and power. UNR supervisory faculty and administrators knew that its faculty mentally, emotionally, and verbally abused and illegally exploited graduate students in a pathological and routine manner; however, UNR did not intervene these and similar occurrences.

31.    UNR knew that its foreign graduate student employees and tenure-track faculty could not file formal complaint to report incidents of abuse and exploitation because they either got used to abuse and exploitation or feared professional retaliation and legal threats. UNR knew that foreign employees had difficulty in seeking protection because they could be repatriated at any time. UNR condoned and ratified a pervasively unsafe, discriminatory, and ethically compromised culture, in which the abuse of power is normalized and accommodated.

1
2
3

*A3. UNR permitted and facilitated Jiang's ventures in abusing his authority for decades.*

32.     Before Jiang came to the U.S., Jiang taught as Lecturer at Zhejiang University of Technology, China, and dated female students. In 1989, Jiang developed a romantic relationship with a 20-year old undergraduate student in his class and later married this student. In 1996, UNR hired Jiang as tenure-track Assistant Professor in the ME department. ME administrators with supervisory authority and Jiang's colleagues in the department well knew his past inappropriate and unprofessional behavior. UNR failed to properly train Jiang regarding its dating violence and sexual misconduct policies. Unrestrained by UNR, Jiang flaunted in front of his students about his past "teacher-student" dating history.

33.     From the beginning of Jiang's career at UNR, Jiang abused and manipulated his graduate students and played brutal mind games in his group. Most of Jiang's graduate students were foreign students from developing countries. They relied on Jiang for their visa renewals, stipends as the only lawful livelihood, degrees, schooling and employment prospects. They were afraid of being dismissed from the program and being terminated from stipends and visas. They were used to Jiang's abuse and felt deeply that they need to please Jiang, who had intense and complete power over their lives. Jiang felt entitled to take whatever he wanted from his foreign students and regarded himself as a "demigod." Jiang did not allow his foreign students to express their own opinions in front of him. Jiang deprecated their intellectual capabilities and brainwashed them that his mercy recruitment and hiring brought them to the U.S. and saved them from their "destitute" or "disgraceful" families.

34.     Jiang required them to obey his orders and furiously yelled at them for any reason and no reason. Jiang compelled them to work in student office and lab at night, particularly from evening to midnight and early hours, and sometimes overnight, in addition to daytime hours. Almost every midnight, Jiang summoned his foreign graduate students to his office with door closed. Jiang exploited them to perform labors for his personal purposes. Jiang made his students to perform childcare work at the student office, to perform yard work at Jiang's house, and to drive him to and from the airport at midnight, for no pay.

35.     ME supervisory faculty, administrators, and Jiang's colleagues well knew of Jiang's decades-long pattern of transportation, routine abuse, and unlawful exploitation against his foreign graduate students. No one ever questioned, reported, and attempted to stop Jiang's abusive and

exploitative behavior. No one ever informed these foreign students of their rights to work and learn in an environment free of discrimination, deterrence, and retaliation. UNR and the ME department normalized pervasive abuse and exploitation against foreign students perpetrated by well-funded and powerful professors.

36.     Jiang had a long history of hiring children of his allies, including Wang in the ME senior leadership, as research assistants in his lab, even though these children had no relevant academic backgrounds. Jiang paid these children using his research grants and the department funding. Through such financial benefits, Jiang further developed and strengthened a sprawling personal and professional network within UNR.

37.     Jiang targeted and recruited young Chinese women as his sex objects. Jiang hired a UNR undergraduate student as a research and teaching assistant in his lab from 2007 to 2012. This undergraduate was a Chinese-origin U.S. citizen. Her's father was a UNR Full Professor. Jiang, over 40 and married, acted as though he had a "crush" on her and pursued her. To please her, Jiang also hired her brother in his lab as an assistant. Jiang frequently picked her up at her apartment for lunches and dinners alone off-campus. She recounted one incident to Fan: Jiang picked her up for dinner and drove her one hour to Pyramid Lake. At Pyramid Lake, Jiang sexually touched and forcibly kissed her. She felt Jiang's behavior was disgusting. Her resistance to Jiang's further sexual advances made Jiang really upset. Due to UNR's failure in training and protecting students, this undergraduate student did not file a formal complaint on Jiang's sexual misconduct with concerns on privacy, retaliation, and defamation.

38.     In 2016, Jiang was instrumental in a discriminatory hiring practice on a tenure-track Assistant Professor position. The department evaluated, interviewed two promising female candidates to fill out the position, but rejected both of them. These two candidates did not need visa sponsorship from UNR. Although rejected by UNR ME department, both of them got tenure-track Assistant Professor positions at prestigious universities. A few months after the department rejected these two candidates, the department senior leadership suddenly announced a hire of a Chinese woman for this position, without interview and evaluation as the department did to the previous two candidates. It turned out that Jiang facilitated this hire because he had special interest in this Chinese woman and believed she could be under control due to her F-1 visa status. The majority of tenure-track Assistant Professors in the department concerned this hiring practice violated UNR policies. Jiang pressured and silenced their voices.

39.     After the Chinese woman was hired, Jiang intended to cultivate her to become his ally. Jiang required Fan to appease this Chinese woman. Jiang instructed Fan to tell this Chinese woman that it was Jiang who was instrumental in hiring her and sponsoring her permanent residency application. In 2018, Jiang lost sexual interest in her.

40.     Jiang wanted young Chinese women as his students and mentees because he wanted to exploit them, mostly for sex, but also for the pleasure of dominating them. Jiang demanded an intense loyalty from his female students whom he treated as sex objects. From 2016 to 2020, Jiang isolated his young female Chinese doctoral student from a male Chinese student in the department. Jiang dictated his female student not to be close to the male student and did not allow the male student to come to see her. Jiang also instructed Fan to notify Jiang if Fan saw the two students were together.

**B. UNR enabled Jiang to slave Fan sexually and benefited from its hostile environment.**

        *B1. 2006-2008: Fan became Jiang's sex slave due to overwhelming power imbalance.*

            *B1.a. Jiang trafficked Fan and subjected Fan to power imbalance.*

41.     In 2005, Jiang met his wife's friend, who was Fan's undergraduate thesis advisor at Shanghai Jiao Tong University, China, regarding recruiting students from China to Jiang's group at UNR. Fan's undergraduate thesis advisor convinced Fan to go to the U.S. and study under Jiang's direction for a M.S. degree at UNR. As tenured Associate Professor and Graduate Program Director in UNR ME Department, Jiang, in his official capacity, recruited Fan from China to the U.S.

42.     In 2006, Fan moved to the U.S. alone and enrolled at UNR on an F-1 visa. Jiang hired Fan with a stipend according to "UNR's Minimum Wages & Salaries." As Fan's advisor and supervisor, Jiang had the power and authority to maintain and jeopardize Fan's visa, grades, degree, schooling and employment prospects. Jiang paid Fan using federal research grants, for which Jiang served as Principal Investigator. UNR charged fringe and overhead from the research grants for the expenditure on hiring Fan. Jiang charged overload salary from the grants for training Fan.

43.     The stipend was the only lawful income for an F-1 student and thus was Fan's entire livelihood. Fan's parents lived in China and had a total family income of approximately $300 per month in 2006 and in the preceding and subsequent years. On this level of income, it was financially impossible for Fan's family to financially support Fan's studies in the U.S., and so Fan was completely reliant upon the stipend that was under Jiang's control.

44.     Jiang asserted his dominance over his foreign students and required his students to satisfy Jiang and complete Jiang's assignments, even though the assignments were labors irrelevant to their academic work. Although Chinese students were acculturated to be submissive, obedient and reverential to their teachers, Jiang fired and expelled at least two Chinese female students before he recruited Fan. Jiang intermittently warned Fan that he would fire her and she did not need to come back to the U.S. for her studies. Fan, like Jiang's other foreign students, quickly became used to abusive rules in Jiang's group and feared Jiang.

45.     Jiang manipulated Fan by furiously screaming Fan for work performance, hatefully blaming students who were fired and expelled by Jiang, and frequently complaining his marital issues (sexless, verbal abuse, etc.)

46.     Jiang sexually harassed and assaulted Fan multiple times. Fan did not know how to protect herself without harmful consequences because UNR failed to protect students and never trained foreign students on Title IX policies and American workplace customs.

47.     Fan did not know what recourse she had at UNR and in the U.S., Fan sought help from more senior students and recounted Jiang's bizarre actions to a postdoc and a doctoral student in Jiang's group. Both of them had been UNR employees for over five years. Neither of them told Fan to report or reported by themselves. They either did nothing in response or taught Fan to tactfully and indirectly reject and not to cross Jiang. Due to UNR's failure to train and protect foreign students, they did not know that they were mandatory reporters.

*B1.b. Jiang forcibly raped Fan and treated Fan as a sex slave.*

48.     One midnight in 2006 October, Fan was at work at midnight as usual. Jiang summoned Fan to his office and raped Fan. Fan was 5'1" and less than 90 lb.; Jiang was 5'11" and about 150 lb. Fan explicitly and verbally said to Jiang "No! No! No! ...," exerted herself against Jiang with her arms and legs, and made her resistance clear with her body language and facial expressions. Jiang did not stop and penetrated Fan with his penis. Jiang forcibly continued to have sex with Fan against Fan's will until he ejaculated inside Fan. Jiang was 42, married; Fan was 23, single.

49.     Right after the rape, Jiang refused to admit he raped Fan over the phone. Jiang furiously berated Fan that he and his wife would file a police report against Fan on sexual harassment and seductive behavior, expel Fan from UNR, and make Fan never be able to renew her visa.

50.     The first rape set the stage for future sexual encounters. From this point forward, Jiang raped and sexually abused Fan many times in work time, at Jiang's office and lab at UNR, around campus in Jiang's personal vehicles, occasionally in Jiang's house and in hotel rooms. Jiang demanded sex with Fan one or two times a week, and sometimes three times a day, always at his initiative and insistence. Jiang's push for rush sex was all from him and about himself. Jiang always ignored Fan's crying and begging to stop during sexual intercourse. Jiang insisted to have sex no matter whether Fan's body was ready or not, and even when Fan begged him not to because she suffered stomach pains and menstrual periods. Almost every time when Jiang started to penetrate Fan, abruptly and painfully, Jiang impatiently said: "relax, open your legs, be quick, and you won't feel pains."

51.     Jiang and Fan's first oral sex was a rape, occurred in 2006 November in Jiang's personal vehicle. In the incident, Fan had a period and Jiang coerced Fan into having oral sex by brutally pushing Fan's head down to his penis, without asking permission, and Jiang ignored Fan saying "I can't". Jiang ejaculated inside Fan's throat.

52.     Jiang warned Fan if Fan made trouble at workplace or Jiang's house, he and his wife would let police arrest Fan and leave Fan a permanent criminal record, and Fan would lose her F1 visa and be deported. Jiang threatened Fan that his wife would let Jiang expel Fan from UNR if Fan told others about the sexual acts, and his wife did not tolerate any plague on the virtuous reputation of their family. Jiang instructed Fan to have a secret abortion by herself if she got pregnant with his child because he would deny he was the father. Jiang warned Fan that Fan would be detested by her parents and friends if they knew of the sexual acts and they would believe him over Fan that Fan seduced him like a lunatic and then no one would marry Fan.

53.     In 2007, UNR promoted Jiang to Full Professor. Jiang's abuse became even more brazen.

54.     In 2007, after Jiang's regular summer travel to China, Jiang returned to Reno, Nevada and proceeded to infect Fan with Chlamydia.

55.     After Fan's diagnosis, UNR Student Health Center requested Fan to provide the identity of Fan's partner. Jiang was the only person who had sex with Fan. Jiang then compelled Fan to lie to UNR Student Health Center by withholding his identity, so that he would not be exposed.

56.     Jiang compelled Fan to share pills the doctor prescribed to Fan for the Chlamydia, in contravention of the doctor's directive and risking Fan's gynecological health.

57.     The brutal sexual intercourses caused urethritis to Fan, bruises to Fan's back and knees, and cuts, bleeding, itching, and swollen to Fan's vagina.

58.     Other than the stipend paid via UNR, Jiang never paid Fan for sexual services out of his own pocket, or reimbursed Fan's expenses on booking hotel rooms as per his requirement. Jiang's pattern of sexual abuse and emotional manipulation caused Fan to believe that if Fan withheld sex, Fan would suffer physical harms and serious damage on her visa, schooling and employment prospects, stipend, and M.S. degree.

59.     While treating Fan as a sex slave, Jiang mentally manipulated Fan into completely trusting him and fearing him and his wife. Jiang intermittently threatened to expel and deport Fan if Fan did not entertain him sexually. Jiang brainwashed Fan that he was the only person who protected her from being reported, expelled, and deported. Occasionally, Jiang showed kindness by deceiving Fan that he treated Fan better than anyone else in the world and what he did was for Fan's sake. Fan was severely trauma bonded with Jiang. Fan internalized Jiang's perception that Jiang was the only person who accepted her dirty regardless of social stigma. Fan internalized guilt, shame, humiliation, and fear.

60.     When Fan hesitated to engage in sex, Jiang furiously berated Fan for being extremely selfish, being ungrateful, returning kindness with ingratitude, not knowing what he did was good for her, *etc*. Jiang manipulated Fan by blaming Fan for not satisfying his research and sexual demands, by holding his signature for Fan's studies and requests to update her visa.

61.     Fan had no emotional outlet and became depressed. Being trampled on human dignity by Jiang, Fan was often devastated. Fan had been suffering Stockholm syndrome and post-traumatic stress disorder in this abusive sexual relationship, nearly an incest relationship in Chinese traditional cultural values and against Fan's moral views.

*B1.c. UNR enabled Jiang to exploit Fan for childcare labor.*

62.     Jiang required Fan to perform childcare work for Jiang's two daughters, Emily Jiang and Jenny Jiang, who were around 8 and 5 in 2006-2007, for hundreds of hours at work time in student office, regardless that Fan needed to fulfill academic requirements. Jiang paid Fan nothing out of his own pocket for child care. UNR never provided training or resources to foreign students to prevent exploitation by their professors. UNR's failure to train and protect foreign students made it impossible for Fan to realize her rights as a student and an employee at UNR.

63.    Administrators, faculty, staff, and student employees in the ME department witnessed that Fan performed childcare work for Jiang in the ME building. Due to UNR's failure in training its employees and the hostile environment in the department, none of them ever questioned, reported, or attempted to stop such exploitation of foreign students perpetrated by Jiang.

*B2. 2015-2019: Jiang trafficked, sexually exploited, and abused Fan again.*

*B2.a. Jiang intentionally enticed and recruited Fan to UNR for sex.*

64.    In 2015, knowing Fan's trauma bonds with him due to his intentional cultivation since 2006, Jiang enticed Fan to apply for a tenure-track Assistant Professor position in the ME department at UNR. Jiang offered to serve as Fan's reference in Fan's application for the job. Jiang deceived Fan that the operation and management in the ME department was improved and UNR provided junior faculty with an environment free of harassment, discrimination, and retaliation.

65.    The other candidate for this position was also a young Chinese female, who was married and did not rely on UNR for her visa. Fan was more vulnerable than this candidate and thus selected as Jiang's target.

66.    Upon knowledge and information, during the hiring process, Jiang knowingly facilitated the recruitment of Fan with the intention of obtaining her sexual services for free.

67.    The ME Department offered Fan a tenure-track Assistant Professor position, and Fan accepted the offer. Jiang, on behalf of the ME Department, pushed Fan to end her student employment at Georgia Tech earlier and move to Reno two weeks earlier than the start day. Fan obeyed and relocated from Atlanta, Georgia, to Reno, Nevada.

68.    Fan then started to work as tenure-track Assistant Professor in the ME department at UNR on an F-1 student visa, later on an H-1B temporary worker visa. UNR was the sponsor of Fan's visa. Under the H-1B requirements, if Fan became unemployed, Fan's visa would be void and Fan had to leave the U.S. immediately.

*B2.b. Jiang forced, deceived, coerced, and exploited Fan for sex.*

69.    Jiang was assigned as Fan's academic mentor and served on the Tenure Committee in the department. Jiang had power to evaluate Fan's performance and influence Fan's employment contract. For several years, Jiang was one of the four tenured faculty members within the department that were eligible to vote on Fan's tenure-or-not.

70.    Jiang reminded Fan that he persuaded the entire department, totally ten faculty members including the Search Committee at that time, to recruit Fan. Jiang reiterated many times how powerful he was to Fan's employment and tenure evaluation. Jiang cautioned Fan that the other two Full Professors in the department did not want to retain Fan. Jiang cautioned Fan that Fan should be grateful to him for getting the job for her and for shielding her from being terminated. Jiang routinely abused Fan verbally, aiming to make Fan believe she was nothing but Jiang's sex slave and her worthless life should be sacrificed anytime for Jiang and Jiang's family.

71.    Fan and Jiang's abusive sexual acts then resumed to the 2006-2008 pattern of "superior-subordinate sex." Jiang made Fan fearfully, gratefully, and sometimes tearfully, satisfy Jiang in sex. The brutal sexual acts still caused urethritis to Fan, bruises to Fan's back and knees, and cuts, bleeding, itching, and swollen to Fan's vagina. Jiang raped and sexually abused Fan many times in Fan's apartment, occasionally in Jiang's house and in hotel rooms. Jiang demanded sex with Fan three or four times a week, and sometimes three times a day, always at his initiative and insistence. Jiang's push for rush sex was all from him and about himself. Jiang often exacerbated Fan's emotional upset and tension, reducing her to tears. Jiang always ignored Fan's crying and begging to slow down during sexual intercourse.

72.    As in 2006-2008, Jiang leveraged his power over Fan's vulnerabilities and treated Fan simply as a mute sex slave or a disposable sex tool. Jiang never offered even a pretense of respect for Fan as a human being. Jiang had little communication, except harsh reprimands, with Fan when Jiang performed brutal sexual acts on Fan. Jiang never promised to marry Fan, or dated Fan, invited Fan for private dinners or trips, or bought Fan any gifts, as what he did to his other sex objects. No basis for consent at will from Fan had ever existed.

73.    To obtain free sexual services from Fan, Jiang repeatedly reminded Fan that no matter how much academic achievements Fan could get, as long as Jiang or ME senior professors did not like her, Fan's tenure application would be denied. The situation described in Jiang's reminder was absolutely true. Jiang reminded Fan that he was instrumental in helping Dean Maragakis, then-Chair Greiner, and other senior faculty obtain promotion, tenure, and grants. Jiang repeatedly intimidated Fan that if Fan displeased Jiang, other senior faculty would consider Fan failed to maintain a good relationship with her mentor and Fan's employment would be terminated. Jiang repeatedly intimidated Fan that then-Chair Greiner plotted to dismiss Fan as what Greiner did to another two foreign tenure-track assistant professors. Jiang repeated intimidated Fan that she should fear and sexually entertain Jiang to keep her job otherwise he would made Fan fired, and then Fan would never be able to find

- 15 -

another tenure-track position in academia. Jiang intermittently threatened to bring a legal action on sexual bribery against Fan and file a police report to jeopardize Fan's visa.

74.     In the College of Engineering at UNR, the employment of a tenure-track Assistant Professor highly depended on grant funding he or she secures. Fan failed to secure funding until 2019. Fan was frequently reminded by the ME senior leadership and other tenure-track faculty in the department on her dangerous position.

75.     Taking all circumstances together, Fan believed that if she displeased Jiang, she would be terminated imminently anytime and lose her H-1B visa that was reliant on her employment at UNR.

*B2.c. Fan attempted to report the sexual exploitation for the first time.*

76.     In 2019 August, Fan's decade-long depression due to the abusive sexual acts reached its peak. On August 13, 2019, at work, Fan spoke to Jiang about reporting the sexual acts according to UNR bylaws and disclosing conflict of interest for Fan's tenure evaluation. Jiang became enraged, aggressively approached Fan, furiously yelled at Fan, raised his fist, and was about to beat Fan. The then-Department Chair Greiner heard Fan's office door was heavily slammed, reported this incident as Fan' unprofessional behavior to HR, and made a record in Fan's annual evaluation and fourth year evaluation for tenure. Jiang then intimidated Fan and asked her to hide the commotion from the then-Chair Greiner and not to expose him, risking the validity of Fan's tenure evaluation. Considering her own vulnerabilities and the deterrent terminations of tenure-track faculty in the department, Fan reluctantly hid Jiang's involvement and did not report the sexual acts.

77.     Fan felt threatened by these actions and requests of Jiang, and Fan felt that her professional standing and the renewal of her H-1B visa were under threat.

78.     Knowing Fan's precarious mental health and mounting depression, Jiang did not stop demanding sex from Fan against her will until the COVID-19 pandemic.

*B3. 2020-2021: Jiang brazenly threatened, retaliated against, and plotted to deport Fan.*

*B3.a. 2020: Jiang threatened Fan's physical safety and professional standing.*

79.     In 2020 April, Fan's ten-year employment-based EB-1A visa was approved. Fan sent Jiang's wife a single text message to confirm if his wife participated in Jiang's conspiracy to exploit Fan sexually.

80.     After that, Jiang and Jiang's wife outrageously confronted Fan at Fan's apartment and office at UNR, making Fan scared for her safety.

81.     In the following couple of months, Jiang made death threats to Fan. Jiang repeatedly warned Fan that his wife wanted to kill Fan and went outside every night for hours. Jiang warned Fan that his wife already hired someone to spy on and follow Fan. Fan felt she might be physically attacked by Jiang and Jiang's wife sometime.

82.     Jiang also threatened to deport Fan from the U.S. and expel Fan from UNR. Jiang told Fan that he would file a police report, apply a protection order against Fan, and make a permanent criminal record to jeopardize Fan's visa, and then Fan would be deported from the U.S. Jiang told to Fan that his wife was about to sue Fan for sexual bribery and adultery. Jiang threatened Fan that he and his wife would notify his allies, including Wang, in the ME department that Fan was an adulteress and ruined Jiang's 30 years marriage, and then they would definitely deny Fan's tenure. Jiang told Fan that he and his wife would ruin Fan's life, tenure, and career. Fan viewed this statement as a threat and felt scared and harassed by Jiang. Jiang intimidated Fan that he would beat Fan if he saw Fan in person.

83.     Meanwhile, Gordaninejad, who was still influential in the ME senior leadership although retired, joined Jiang to threaten and silence Fan from reporting Jiang. Gordaninejad relayed the threatening message that UNR would definitely fire Fan if Fan spoke up.

84.     To worsen Fan's mental anguish, Jiang played brutal mind games with Fan. Jiang slut shamed and insulted Fan. To make Fan internalize guilt, shame, humiliation, and fear, Jiang disparaged Fan that Fan was extremely selfish, was ungrateful, seduced a married teacher of her father's age, hurt his virtuous family, destroyed herself by doing wrong things, was asking for being killed by him, *etc*. Jiang reminded Fan that UNR would protect Jiang and he would make Fan fired and deported if Fan reported the sexual acts to UNR.

85.     Fan's mental and psychological health became more and more precarious. Jiang and his wife caused Fan to have suicidal thoughts that were serious and disturbing for more than two years.

*B3.b. 2021: Jiang plotted to deport Fan from the U.S. and expel Fan from UNR.*

86.     In 2021 February, Jiang requested a protection order against Fan after he learned of Fan's Title IX complaint. Jiang falsely accused Fan of making many death threats and requested to restrain Fan's access to UNR campus. Through an issued temporary *ex parte* protection order, Jiang

successfully restrained Fan from performing routine work and parking her vehicle on campus. Jiang planned to find an opportunity to let the police arrest and deport Fan through the temporary protection order as he plotted.

87.    To support his allegation, Jiang fabricated WeChat messages. Jiang falsely accused Fan of vandalizing his office, falsely claimed that he and Fan had a consensual affair, and falsely claimed that Fan refused to sever the abusive sexual acts and threatened to tell his wife. Jiang said to the Judge that his purpose was to deprive Fan's right of gun possession.

88.    Jiang intentionally hid the abusive nature of his rapes and the "superior-subordinate" sexual acts, which could never be consent, not only because Jiang's use of power and privilege rendered invalid whatever consent he obtained to engage with Fan sexually, but also because Fan never gave consent at will.

89.    Although an extended protection order was denied, Jiang caused severe and irretrievable damage on Fan's professional reputation, employment opportunities in academia, and already precarious mental and psychological conditions.

90.    Jiang continued his plot via other means. To ruin Fan's tenure-track employment, Jiang filed a Title IX complaint against Fan with UNR, alleging that Fan threatened him to have sex with her, sexually harassed and made death threats to him and his family, and vandalized his office.

91.    To jeopardize Fan's visa and deport Fan from the U.S., Jiang filed a police report against Fan, alleging that Fan made death threats to his family and vandalized his office.

92.    Jiang and his allies spread defamatory statements about Fan at workplace among faculty and students within and outside UNR. These statements included: Fan made death threats to him and his family, Fan vandalized Jiang's office, Fan threatened to expose Jiang, Fan was too in love with Jiang, Fan got mad when Jiang broke up with her, Fan was mentally disordered, *etc.*

93.    Jiang's false statements actively sabotaged Fan's work environment at UNR and disparaged Fan's professional reputation among fellow academics and academic institutions. Jiang's statements falsely indicated that Fan committed crimes and proactively engaged in sexual misconduct. Jiang's defamation ensued widespread condemnation of Fan's reputation and sabotaged Fan's employment prospects in academic departments worldwide because commitment of crimes or sexual misconduct is incompatible with Fan's profession.

1

2

3

4       ***C. UNR deliberately covered up its complicity in Jiang's abuse and its institutional corruption.***

5            *C1. UNR refused to act on Fan's report of sexual abuse, threats, and retaliation.*

6            94.      On January 01, 2021, Fan reported Jiang's sexual misconduct to the Department Chair,

7       Petros Voulgaris ("Voulgaris"). Fan was notified by the Chair that UNR Title IX Office might contact

8       Fan for an investigation.

9            95.      Since Fan was not contacted by any Title IX staff, Fan then filed a formal complaint

10      against Jiang directly with Title IX Office on January 29, 2021.

11           96.      In 2021 April, Fan emailed the then-Vice Provost of Faculty Affairs, Jill Heaton

12      ("Heaton"), Dean Maragakis, and Chair Voulgaris, and inquired whether she could meet an

13      administrator with supervisory authority on reporting the hostile work environment by a tenure-track

        Assistant Professor and relevant concerns.

14           97.      Then-Vice Provost Heaton, Dean Maragakis, and Chair Voulgaris denied Fan's inquiry

15      of meeting with an administrator up the chain of command. Dean Maragakis advised Fan to retain a

16      counsel for communicating with UNR Counsel.

17           98.      Fan submitted overwhelming evidence on Jiang's sexual abuse, threats, defamation,

18      and retaliation, and a list of witnesses to Title IX. The evidence included Jiang's testimony under oath

19      made in Reno Justice Court, in which Jiang confessed he exploited Fan for sex since 2006 when he

20      was Fan's thesis advisor and mentor, and when he had power to vote on Fan's tenure-or-not. The

        evidence included Jiang's text messages, in which Jiang confessed he raped Fan in his office in 2006.

21           99.      UNR willfully ignored the overwhelming evidence that Jiang engaged in a pattern of

22      sex slavery, sexual abuse, threats, deterrence, and retaliation. UNR refused to interview the witnesses

23      Fan identified.

24           100.     A few months later, Fan contacted the Office of Vice Provost of Faculty Affairs to

25      inquiry if she could make an appointment with an administrator or staff in the Office regarding her

26      concerns. Fan's inquiry was denied again.

27           101.     UNR intentionally and willfully made no visible progress on its sham investigation

28      against Jiang until now. Knowing Jiang was a serial sexual predator, UNR continued to allow Jiang to

supervise and access vulnerable female students and junior faculty in a leadership position. UNR refused to take any corrective actions or impose appropriate sanctions to Jiang, but encouraged the acts of sex slavery and abuse of power by awarding Jiang another fully-paid sabbatical leave in China.

### C2. UNR covered up for Jiang and retaliated against Fan, derailing Fan's career.

102.    In the only response to Fan's complaint issued on May 14, 2021, UNR stated the sexual acts between Jiang and Fan were only "alleged," ignoring the overwhelming evidence Fan submitted. Further, UNR described the sexual acts as a "romantic relationship," ignoring Fan's statements and the huge power imbalance between Jiang and Fan. UNR's position is clear: Fan was the person who should be responsible for the sexual acts; Fan posed death threats to Jiang and Jiang's family; Jiang and itself were innocent all the time.

103.    By contrast, in response to Jiang's Title IX complaint against Fan, UNR affirmatively and unilaterally concluded that Fan performed "sufficiently severe, persistent" sexual harassment in a notice issued to Fan on December 10, 2021.

104.    While refusing to protect Fan or take any disciplinary actions against Jiang, UNR acted against Fan immediately upon receiving Jiang's complaint, although Jiang's complaint came several months later after Fan's complaint. UNR issued a no-contact order on May 14, 2021, with an unequal clause by restraining Fan from contacting Jiang's family. UNR was aware that Jiang's wife confronted and threatened Fan and Fan had no family in the U.S.; however, UNR did not equally restrain Jiang's family from contacting Fan.

105.    UNR Title IX investigator who was in charge of Jiang's complaint informed Fan that a sanction hearing on Fan's sexual misconduct was anticipated to be scheduled in 2022 May. By contrast, no hearing was anticipated or attempted to be scheduled on Jiang's misconduct alleged in Fan's complaint in the near future.

106.    When UNR took no action against Jiang and was complicit in Jiang's defamation on Fan on and off campus by discrediting Fan's allegations, Fan's reputation and credibility were assailed. Fan suffered personal humiliation from workplace, especially from Jiang's allies.

107.    For instance, before a committee meeting within the department in 2021 September, Fan reported Jiang's threats and raised her concerns on possible encounters and tension with Jiang to Wang, who served as a few Committee Chairs. Wang replied to Fan that he did not want to get involved in a situation between Fan and Jiang. Wang's statement indicated that it was a personal

matter due to Fan's own fault, dissuading Fan from insisting to fight the longstanding hostile environment in the department.

108.    In 2022 January, UNR imposed interim measures against Fan rooting from the ongoing Title IX investigation due to Jiang's complaint regarding Fan's sexual misconduct. UNR notified the federal funding agencies that funded Fan for research of the interim measures.

109.    It took Fan years to understand the extent of sexual, psychological, and emotional abuse perpetrated by Jiang and to sever her trauma bond with Jiang. Fan's academic performance and career suffered due to the deterioration of her physical, mental, psychological health, and reputational harm caused by the longstanding sex slavery, sexual abuse, threats, deterrence, retaliation, the hostile environment. For years, Fan found no avenue to file a complaint that could not harm her employment prospects and visa. UNR's cycle of institutional betrayal further harmed Fan's reputation, professional standing, and career.

110.    UNR refused to hold Jiang responsible for his pattern of sex slavery, sexual abuse, threats, and retaliation. UNR refused to protect Fan from Jiang's further professional retaliation or possible physical harm. Instead, UNR retaliated against Fan by initiating a years-long process stacked against Fan and making investigations and disciplinary actions in Jiang's favor. Only through Fan's own recent investigation and the resulting fallout of decades of abuse within the department did Fan learn of UNR's long-standing complicity in the abuse perpetrated by its senior faculty.

### *C3. UNR financially benefited from its hostile environment that enabled Jiang's abuse.*

111.    UNR's systemic failures created and facilitated the long-standing hostile environment for vulnerable student employees and junior faculty in its ME department, in which Jiang abused his power to traffic, sexually slave, threaten, deter, and retaliated against Fan. For decades, UNR failed to supervise, train, correct and discipline its employees; UNR failed to create a clear and effective reporting avenue that could avoid retaliation against vulnerable groups; UNR failed to stop discriminatory and exploitative labor practices, including sex services and unlawful labor, and facilitated continued occurrences. UNR's systemic failures were particularly acute for foreign students and tenure-track faculty who had vulnerabilities in visa route, language, custom, and culture barrier.

112.    UNR's entire system and the longstanding hostile work environment within the ME department enabled Jiang to abuse his complete and intense power, and to traffic, sexually slave, deter, and retaliate against Fan for years without official scrutiny.

113.    UNR's business model relied on its reputation and standing within the academic world, which were tied to its faculty's accomplishments and prestige, to entice student enrollment for monetary benefits and to obtain external funding on research and infrastructure. Therefore, UNR views its influential and powerful senior faculty as a valuable asset to its revenue.

114.    In particular, UNR's College of Engineering made a special effort to create exchange programs with Chinese universities and to entice more Chinese government-funded or self-funded students to increase revenue. UNR considered senior faculty, including Jiang, who had strong ties with Chinese universities would be instrumental in creating exchange programs.

115.    UNR put its revenue above rules and actively facilitated the abuse of vulnerable students and junior faculty to flourish for financial benefits. UNR charged indirect cost from the research funding its senior faculty secured from federal and state government agencies and industrial sponsors. UNR knowingly allowed its senior faculty to abuse and exploit vulnerable employees paid by the funding, for their own benefits, including sexual demands and free labor to enrich themselves.

116.    UNR was in complicit in concealing the deceptive practices when UNR recruited these employees through its senior faculty and authorities in their official capacities. UNR failed to disclose the existence of its hostile environment for vulnerable student and faculty employees to applicants. UNR failed to disclose the deficiencies in its reporting systems and deficiencies in its rules regarding supervision, training, and retention to applicants. UNR failed to disclose forced labor and involuntary servitude performed by international students who were paid by the grants to the funding agencies. UNR ran afoul of government requirements for F-1 and H-1B visas because the forced labor for its senior faculty's own benefits was beyond the scope of the work sponsored by federal and state funding and was unlawful.

117.    UNR actively covered up for itself and its senior faculty so as not to disrupt its reputation and funding sources. Knowing the hostile environment in its ME department, UNR continued to provide no training to foreign student employees on its policies. UNR continued to financially benefit from its hostile environment that accommodated Jiang's abuse by collecting money through sponsorships, grants, and for Jiang's recruitment and training of other students.

## CLAIMS FOR RELIEF

### COUNT I

### FORCED LABOR IN VIOLATION OF 18 U.S.C. § 1589(b), § 1595(a)

118.    Fan realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

119.    Fan is authorized to bring this civil claim against the Defendant pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

120.    Section 1595 provides a civil cause of action for victims of any crime under Chapter 77, Title 18 of the United States Code. 18 U.S.C. § 1595.

121.    Section 1589 prohibits forced labor or services: (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means –

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm of threats of serious harm to that person or another person

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

122.    Section 1589(b) provides: (b) Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

123.    Pursuant to Section 1589(b), an entity can be liable for violation of Section 1589's prohibition on forced labor or services "simply by benefiting financially from participation in a 'venture' with the primary offender." *Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019). *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112 (D. Colo. 2019).

124.    Section 1595(a) creates liability simply for knowingly benefiting from a venture "which that person knew or should have known has engaged in an act in violation of the TVPA." The statute does not require that "whoever knowingly benefits" from a venture have knowledge shortly

after the alleged abuse occurs, or even of the specific victim of the abuse. *Gilbert v. U.S. Olympic Comm.*, Civil Action No. 18-cv-00981-CMA-MEH (D. Colo. Mar. 6, 2019).

125.    Nothing in Section 1595(a) requires the party to benefit from the forced labor or services for liability to attach and that the party need not be involved in obtaining forced labor or services to be civilly liable under the venture theory of liability. Civil liability attaches when, under proper circumstances, a party knowingly benefits from participation in a venture. The party need not be involved in obtaining forced labor or services to be civilly liable to a plaintiff claiming a TVPA violation. *Gilbert v. U.S. Olympic Comm.*, Civil Action No. 18-cv-00981-CMA-MEH (D. Colo. Mar. 6, 2019). *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112 (D. Colo. 2019).

126.    "Labor and services" in Section 1589(a) covers coerced sexual acts. *U.S. v. Kaufman*, 546 F.3d 1242, 1259-63 (10th Cir. 2008).

127.    "Serious harm" in Section 1589(c)(2) is defined as "any harm whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."

128.    "Abuse or threatened abuse of law or legal process" in Section 1589(c)(1) is defined as "the use or threatened use of a law or legal process … in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."

129.    "Serious harm or threats of serious harm" in Section 1589(a)(2) or (4) or "abuse of the legal process" in Section 1589(a)(3) covers threats with immigration consequences and threats of deportation. *Aragon v. Che Ku*, 277 F. Supp. 3d 1055 (D. Minn. 2017). *Ramos-Madrigal v. Mendiola Forestry Service, LLC*, 799 F. Supp. 2d 958 (W.D. Ark. 2011). *Bucco v. W. Iowa Tech Cmty. Coll.*, No. C21-4001-LTS (N.D. Iowa Mar. 1, 2022).

130.    While the term "venture" has not been defined in the context of Section 1589(b), the First Circuit recently persuasively applied the definition from another TVPRA subsection to the forced labor context. In Section 1591(e)(6), "venture" is defined as "any group of two or more individuals associated in fact, whether or not a legal entity." *Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019). *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017). *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112 (D. Colo. 2019).

131.    1589(b) does not requires that the venture itself engaged in obtaining the labor or services by force. 1589(b) does not require that the defendant's participation be an overt act in furtherance of the other member's TVPA violation. *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112 (D. Colo. 2019).

132.    First, the relationship among senior faculty, tenure-track faculty, and UNR, under the circumstance of the decades-long toxic environment within the ME department, established a venture under Section 1589(b).

133.    Second, the venture engaged in obtaining Fan's labor or services in violation of TVPA; but for the venture, Jiang would not have obtained – nor have been able to obtain – Fan's sexual services. When Jiang obtained Fan's services, Jiang was acting as a part of the venture; that is, but for the venture, Jiang could not have obtained sexual services from Fan.

134.    Third, UNR knowingly benefited from its relationship – participation in the venture – with Jiang, for enticing student enrollment, securing grants, training student employees paid by his grants, and mentoring tenure-track faculty to secure grants, in his capacities, despite indications that Fan was abused, raped, threatened, and retaliated against.

135.    Fourth, UNR knew or should have known and recklessly disregarded the decades-long transportation, abuse, and exploitation of vulnerable employees perpetrated by its senior faculty and the toxic culture in its ME department. After Fan filed a Title IX complaint in 2021 January, UNR knew or recklessly disregarded that Jiang had obtained sexual services of Fan by means of serious harm or threats of serious harm, but failed to take proper steps to implement training and other preventative measures.

136.    The argument that UNR may not have known about Jiang's sex slavery of Fan until long after it had ceased does not protect UNR from the reach of the TVPA. *Gilbert v. U.S. Olympic Comm.*, Civil Action No. 18-cv-00981-CMA-MEH (D. Colo. Mar. 6, 2019).

137.    As a direct and proximate result of the actions of UNR detailed in this complaint, Fan has suffered severe physical, mental, emotional, financial, reputational, and professional harm, and the harm continues.

138.    Fan has suffered, and continues to suffer, damages in an amount to be proven at trial, including attorney's fees, injunctive relief, and other relief that the Court may deem proper.

COUNT II

TRAFFICKING WITH RESPECT TO FORCED LABOR IN VIOLATION OF 18 U.S.C. § 1590(a), § 1595(a)

139.   Fan realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

140.   Fan is authorized to bring this civil claim against the Defendant pursuant to the civil remedies provision of 18 U.S.C. § 1595(a). Section 1595(a) includes venture liability for an entity who knowingly benefits from participation in a venture engaged in a TVPA violation.

141.   The TVPA imposes Section 1595(a)'s venture liability for trafficking, which is separate and distinct from liability for forced labor or services. *Baxla v. Chaudhri*, 225 F. Supp. 3D 588, 593 (E.D. Va. 2016). *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112 (D. Colo. 2019). Section 1590 prohibits trafficking with respect to forced labor: Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be published.

142.   "Labor and services" in Section 1590(a) covers coerced sexual acts. *U.S. v. Kaufman*, 546 F.3d 1242, 1259-63 (10th Cir. 2008).

143.   While the term "venture" has not been defined in the context of Section 1589(b), the first Circuit recently persuasively applied the definition from another TVPRA subsection to the forced labor context. In Section 1591(e)(6), "venture" is defined as "any group of two or more individuals associated in fact, whether or not a legal entity." *Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019). *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017). *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112 (D. Colo. 2019).

144.   UNR, through its faculty and authorities in their official capacities knowingly subjected young foreign female employees, including Fan, to trafficking by recruiting them to its campus with the promise of employment opportunities and visas. UNR's efforts in this regard are an affirmative and deliberate means of obtaining funding for itself.

145.   UNR is liable under Section 1595(a)'s the venture theory. UNR knew or should have known that Fan had been recruited, transported, and obtained for forced sexual labor or services. UNR knowingly benefited, financially, from participation in a venture with Jiang, who UNR knew or should

have known had engaged in an act in violation of 18 U.S.C. §§ 1590(a) and 1595(a) by transporting Fan for her sexual labor or services. The venture, which enabled Jiang to obtain Fan's sexual labor or services, was UNR's relationship with Jiang under the decades-long toxic environment in its ME department. UNR benefited from the venture by collecting money through tuition, sponsorships, grants, and for Jiang's transportation, recruitment, and training of students, for Jiang's mentoring of tenure-track faculty to secure grants.

146.    As a direct and proximate result of the actions of UNR detailed in this complaint, Fan has suffered severe physical, mental, emotional, financial, reputational, and professional harm, and the harm continues.

147.    Fan has suffered, and continues to suffer, damages in an amount to be proven at trial, including attorney's fees, injunctive relief, and other relief that the Court may deem proper.

<u>COUNT III</u>

<u>SEX TRAFFICKING IN VIOLATION OF 18 U.S.C. § 1591(a), § 1595(a)</u>

148.    Fan realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

149.    Fan is authorized to bring this civil claim against the Defendant pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

150.    Section 1591 provides as follows: (a) Whoever knowingly –

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means of a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, … , shall be published as provided in subsection (b).

151.    "Commercial sex act" is defined in Section 1591(e)(3) as "any sex act, on account of which anything of value is given to or received by any person."

152.    "Venture" is defined in Section 1591(e)(6) as "any group of two or more individuals associated in fact, whether or not a legal entity."

153.    "Interstate commerce" includes individual instances of conduct with only a *de minimis* effect on interstate commerce so long as the class of activity regulated is economic or commercial in nature. The conduct need only cross state lines or be an act or transaction that is economic in nature that affects the flow of money in the stream of commerce to any degree. *United States v. Walls*, 784 F.3d 543 (9th Cir. 2015).

154.    "Anything of value" encompasses more than simply monetary exchanges. *Noble v. Weinstein*, 335 F. Supp. 3d 504 (S.D.N.Y. 2018).

155.    Section 1595(a), by its terms, provides a civil remedy to a victim of, *inter alia*, sex trafficking. The victim may bring a civil action to recover damages and attorney's fees from "whoever knowingly benefits … from participation in a venture what that person knew or should have known has engaged in a sex trafficking venture.

156.    The phrase "knew or should have known" echoes common language used in describing an objective standard of negligence. The "should have known" language in the civil liability provision adds a constructive knowledge alternative to the existing actual knowledge standard. All Congress requires a victim to plead is knowingly benefited from participating in a venture which it should have known engaged in her trafficking. *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio 2019). *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171 (E.D. Pa. 2020). *A.B. v. Marriott Int'l, Inc.*, CIVIL ACTION No. 19-5770 (E.D. Pa. July 6, 2020).

157.    "Participation in a venture" did not require the defendant to have directly participated in the sex trafficking. The civil context focuses on whether the business should have known of the conduct. *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171 (E.D. Pa. 2020).

158.    Section 1595(a) does not require that "whoever knowingly benefits" from a venture have knowledge shortly after the alleged abuse occurs, or even of the specific victim of the abuse. *Gilbert v. U.S. Olympic Comm.*, Civil Action No. 18-cv-00981-CMA-MEH (D. Colo. Mar. 6, 2019).

159.     The "overt act" and "sex trafficking venture" requirements apply when establishing criminal liability under section 1591 of the Act but do not govern civil claims brought under section 1595. *A.B. v. Marriott Int'l, Inc.*, CIVIL ACTION No. 19-5770 (E.D. Pa. July 6, 2020).

160.     First, UNR participated in a venture. The venture was its symbiotic relationship with Jiang under the toxic environment within the ME department. For over a decade, UNR facilitated the toxic environment in its ME department and the failures of ME senior leadership. UNR affirmatively enabled and concealed Jiang's predatory behaviors toward and sexual relationships with vulnerable students and mentees, as a means of keeping him productive in obtaining funding and other accomplishments. This venture enabled Jiang to traffic and sexually slave Fan.

161.     Second, UNR knowingly benefited financially from the venture. UNR financially benefited from the toxic environment in the ME department and the ME senior leadership, by enticing student enrollment, obtaining sponsorships and grants, recruiting and training foreign employees and charging indirect cost through its powerful and influential senior faculty. Even after Fan reported Jiang's abuse, UNR covered up its complicity in Jiang's trafficking and sex slavery and its systemic failures in many aspects so as not to disrupt its ongoing reputation and funding sources.

162.     Third, UNR knew, or at the very least should have known, of the trafficking perpetrated by its senior faculty, including Jiang. For over a decade, UNR ignored the abuse and exploitation perpetrated by its ME senior faculty, including Jiang; UNR intentionally failed, and/or refused, to provide foreign employees with a clear and safe reporting revenue, although UNR completely understood the vulnerabilities of foreign employees; UNR covered up the abuse and exploitation perpetrated by its powerful and influential senior faculty and performed sham investigations to protect itself when UNR received formal complaints and could not ignore the proof anymore; UNR deterred, retaliated against, and dismissed vulnerable foreign employees who spoke up; UNR consistently refused and failed to implement proper staff training and take adequate measures to prevent or not to profit from sex trafficking of foreign employees.

163.     The argument that UNR may not have known about Jiang's sex trafficking of Fan until long after it had ceased does not protect UNR from the reach of the TVPA. *Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 711 F.3d 1136 (9th Cir. 2013). (See *Nunag-Tanedo*, 790 F. Supp. 2D at 1147). *Gilbert v. U.S. Olympic Comm.*, Civil Action No. 18-cv-00981-CMA-MEH (D. Colo. Mar. 6, 2019).

164.    As a direct and proximate result of the actions of UNR detailed in this complaint, Fan has suffered severe physical, mental, emotional, financial, reputational, and professional harm, and the harm continues.

165.    Fan has suffered, and continues to suffer, damages in an amount to be proven at trial, including attorney's fees, injunctive relief, and other relief that the Court may deem proper.

<u>COUNT IV</u>

<u>DELIBERATE INDIFFERENCE IN VIOLATION OF TITLE IX 20 U.S.C. § 1681</u>

166.    Fan realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

167.    Fan alleges violations of Title IX against UNR due to its deliberate indifference to gender discrimination, hostile work environment, and retaliation.

168.    UNR has subjected Fan, through deliberate indifference, to discrimination based on her gender, visa status, and national origin, including sex slavery, deterrence, retaliation, and a hostile environment that was sufficiently severe, pervasive, and objectively offensive to interfere with her life. The consequences have been devastating for Fan: Jiang and his enabler, UNR, destroyed Fan's professional standing, employment opportunities, and career. UNR deprived Fan of a safe workplace and deprived Fan of the benefits of her employment contracts. Relevant UNR actions include, but are not limited to:

a.  UNR's decades-long deliberate indifference to the complaints on the toxic environment and the abusive culture not only enabled hostile environment, but also enabled deterrence and retaliation by the powerful and influential senior faculty. For over a decade, UNR maintained a culture within its ME department in which the abuse of power and authorization was normalized and accommodated.

b. For over a decade, UNR did not take measures to protect foreign students or employees from unlawful labor exploitation, sex slavery, deterrence, and retaliation on their professional standing, schooling and employment prospects, visa status, and physical safety. Instead, UNR had a regular practice of discrediting, retaliating, and dismissing foreign employees who raised concerns about its abusive and hostile environment. This environment made Fan afraid to disclose the abuse until her EB-1A

visa was approved. UNR's retaliatory actions dissuaded Fan from reporting the abuse until Fan's tenure was recommended to the Board of Regents.

c. Since 2006, Jiang, in his official capacity, raped, sexually slaved, threatened, deterred, and retaliated against Fan, which created a hostile environment. In 2020, after Jiang learned that Fan disclosed the sexual acts, Jiang plotted to deport Fan from the U.S. and expel Fan from UNR and academia.

d. In 2021, UNR faculty and administrators with supervisory authority ignored Fan's requests on inquiring about the relevant issues and concerns regarding Jiang's sex slavery and retaliation, and the implications on Fan's employment status, but instead advised Fan to retain a legal counsel for communicating with the UNR counsel.

e. After Fan filed formal Title IX complaints starting in 2021 January, UNR intentionally discredited Fan and disparaged Fan's professional standing and reputation by imposing interim measures that were unfair and unresponsive to Fan.

f. UNR intentionally dragged the investigation process out and never made visible progress in its sham investigation of Jiang's sexual abuse, defamation, deterrence, and retaliation, even though UNR had Jiang's own testimony under oath that he had sexual acts with Fan when he was Fan advisor and mentor and when he had power and authority to vote on Fan's promotion to a tenure position.

g. After Fan filed formal complaints, UNR took no apparent steps to stop powerful and influential perpetrators, including Jiang, from following through on their abuse, threats, and retaliation, or targeting vulnerable students and faculty.

169.   Instead of stopping discrimination and the abusive and hostile environment, UNR perpetrated it and exacerbated the original harm, subjecting Fan to additional trauma and left Fan more vulnerable to retaliation at the hands of Jiang and his allies.

170.   UNR's deliberate indifference has harmed and continues to harm Fan. UNR's failures to prevent and redress Jiang's abuse and retaliation have profoundly ruined Fan's professional standing, career prospects, future employment opportunities. UNR facilitated Jiang to force Fan to leave academia, derailing Fan's academic trajectory and wasting years of Fan's life and dedicated work. As a result of the abuse she endured at UNR, Fan suffered severe physical, mental, emotional,

financial, reputational, and professional harm, which are ongoing and will continue for the foreseeable future.

171.    Because of the continuous nature of UNR's unlawful conduct, Fan is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

172.    Because a reasonable person in Fan's position would have first discovered that UNR's unlawful practices and handling of prior complaints against senior faculty in the ME department were the probable cause of her injury within the applicable limitations period, Fan is entitled to the application of the discovery rule to the unlawful acts alleged herein.

173.    Because Jiang, in his official capacity, and Gordaninejad, retired but still influential, threatened Fan's physical safety, visa status, employment, and career if Fan spoke out about Jiang's misconduct, because Jiang plotted to deport Fan from the U.S. and dismiss Fan from UNR, because UNR ratified those threats by failing to act on the threats and ignoring Fan's requests to report to administrators up the chain of command, and because those threats induced Fan to keep silent about Jiang's misconduct until 2021 January, equity estops UNR from relying on the statute of limitations.

174.    Accrual under federal common law occurs and the prescriptive period begins to run the moment a plaintiff becomes aware that he/she has suffered an injury. *McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019). A plaintiff's awareness encompasses two elements: (1) The existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions. *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001). Thus, a plaintiff needs to have an awareness of the facts that would ultimately support the claim.

175.    Only through Fan's own recent investigation and the resulting fallout of UNR's longstanding complicity with the ME senior leadership, was Fan able to know that (1) UNR was deliberately indifferent to the discrimination, hostile work environment, deterrence, and retaliation; and (2) that there was a direct causal connection between UNR's continued failures to act and the discrimination, hostile work environment, and retaliation Fan experienced.

176.    Fan is entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorney's fees and costs, and other appropriate relief.

177. As a direct and proximate result of the actions of UNR detailed in this complaint, Fan has suffered severe physical, mental, emotional, financial, reputational, and professional harm, and the harm continues.

178.    Fan has suffered, and continues to suffer, damages in an amount to be proven at trial, including attorney's fees, injunctive relief, and other relief that the Court may deem proper.

<u>COUNT V</u>

<u>HOSTILE ENVIRONMENT IN VIOLATION OF TITLE IX 20 U.S.C. § 1681</u>

179.    Fan realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

180.    Fan alleges violations of Title IX against UNR due to its hostile work environment.

181.    UNR has subjected Fan to a hostile work environment, in which UNR cultivated, ratified, perpetuated and/or engaged in discrimination based on her gender, visa status, and national origin, sex slavery, deterrence, and retaliation against Fan. The hostile environment was sufficiently severe, pervasive, and objectively offensive to interfere with Fan's life and to cause actual harm to Fan. UNR failed and refused to take remedial actions. The consequences have been devastating to Fan: Jiang and his enabler, UNR, destroyed Fan's professional standing, career, and future employment opportunities in academia. UNR deprived her of a normal workplace and the benefits of her employment contracts. Relevant actions include, but are not limited to:

a.  UNR's decades-long deliberate indifference to the complaints on the toxic environment and abusive culture not only enabled hostile environment, but also enabled retaliation by the powerful and influential senior faculty. For over a decade, UNR maintained a culture within its ME department in which the abuse of power was normalized and accommodated.

b. For over a decade, UNR did not take measures to protect foreign students or employees from unlawful labor exploitation, sex slavery, deterrence, and retaliation on their professional standing, schooling and employment prospects, visa status, and physical safety. Instead, UNR had a regular practice of discrediting, retaliating, and dismissing foreign employees who raised concerns about its abusive and hostile environment. This environment made Fan afraid to disclose the abuse until her EB-1A

visa was approved. UNR's retaliatory actions dissuaded Fan from reporting the abuse until Fan's tenure was recommended to the Board of Regents.

c. Since 2006, Jiang, in his official capacity, raped, sexually slaved, threatened, deterred, and retaliated against Fan, which created a hostile environment. In 2020, after Jiang learned that Fan disclosed the sexual acts, Jiang plotted to deport Fan from the U.S. and expel Fan from UNR and academia.

d. After Fan filed formal Title IX complaints since 2021 January, UNR intentionally discredited Fan and disparaged Fan's professional standing and reputation by imposing interim measures that stacked against Fan.

e. UNR intentionally dragged the investigation process out and never made visible progress in its sham investigation of Jiang's sexual misconduct, defamation, deterrence, and retaliation, even though UNR had Jiang's own testimony under oath that he had sexual acts with Fan when he was Fan advisor and mentor and when he had authority to evaluate and vote on Fan's tenure-or-not.

f. After Fan filed formal complaints, UNR took no apparent steps to stop powerful and influential perpetrators, including Jiang, from following through on their abuse, threats, and retaliation, or targeting vulnerable students and faculty.

182.    Instead of stopping the hostile environment, UNR perpetrated it and exacerbated the original harm, subjecting Fan to additional trauma and left Fan more vulnerable to retaliation at the hands of Jiang and his allies.

183.    UNR's long-standing failures in many aspects created a hostile environment for Fan and has harmed and continues to harm Fan. UNR's failures to prevent and redress Jiang's abuse and retaliation have profoundly ruined Fan's professional standing, career prospects, and future employment opportunities. UNR facilitated Jiang to force Fan to leave academia, derailing Fan's academic trajectory and wasting years of Fan's life and dedicated work. As a result of the abuse she endured at UNR, Fan suffered severe physical, mental, emotional, financial, reputational, and professional harm, which will continue for the foreseeable future.

184.    Because of the continuous nature of UNR's unlawful conduct, Fan is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

185.    Because a reasonable person in Fan's position would have first discovered that UNR's unlawful practices and handling of prior complaints against senior faculty in the ME department were the probable cause of her injury within the applicable limitations period, Fan is entitled to the application of the discovery rule to the unlawful acts alleged herein.

186.    Because Jiang, in his official capacity, and Gordaninejad, retired but still influential, threatened Fan's physical safety, visa status, employment, and career if Fan spoke out about Jiang's misconduct, because Jiang plotted to deport Fan from the U.S. and dismiss Fan from UNR, because UNR ratified those threats by failing to act on the threats and ignoring Fan's requests to report to administrators up the chain of command, and because those threats induced Fan to keep silent about Jiang's misconduct until 2021 January, equity estops UNR from relying on the statute of limitations.

187.    Accrual under federal common law occurs and the prescriptive period begins to run the moment a plaintiff becomes aware that he/she has suffered an injury. *McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019). A plaintiff's awareness encompasses two elements: (1) The existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions. *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001). Thus, a plaintiff needs to have an awareness of the facts that would ultimately support the claim.

188.    Only through Fan's own recent investigation and the resulting fallout of UNR's longstanding complicity with the ME senior leadership, was Fan able to know that (1) UNR created, ratified, and/or engaged in the discrimination, hostile work environment, deterrence, and retaliation; and (2) that there was a direct causal connection between UNR's continued failures to act and the discrimination, hostile work environment, deterrence, and retaliation Fan experienced.

189.    Fan is entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorney's fees and costs, and other appropriate relief.

190. As a direct and proximate result of the actions of UNR detailed in this complaint, Fan has suffered severe physical, mental, emotional, financial, reputational, and professional harm, and the harm continues.

191.    Fan has suffered, and continues to suffer, damages in an amount to be proven at trial, including attorney's fees, injunctive relief, and other relief that the Court may deem proper.

<u>COUNT VI</u>

<u>GENDER DISCRIMINATION IN VIOLATION OF TITLE IX 20 U.S.C. § 1681</u>

192.    Fan realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

193.    Fan alleges violations of Title IX against UNR due to its gender discrimination, hostile work environment, and retaliation.

194.    UNR has subjected Fan to gender discrimination that was sufficiently severe, pervasive, and objectively offensive to interfere with her life. The consequences have been devastating: Jiang and his enabler, UNR, destroyed her professional standing, future employment opportunities, and career. UNR deprived her of a normal work environment and the benefits of her employment contracts. Relevant actions include, but are not limited to:

   a. UNR's decades-long deliberate indifference to the complaints on the toxic environment and abusive culture not only enabled the hostile environment within its ME department, but also enabled retaliation by the powerful and influential senior faculty. For over a decade, UNR maintained a toxic culture within its ME department, in which the abuse of power was normalized and accommodated.

   b. For over a decade, UNR did not take measures to protect foreign students or employees from unlawful labor exploitation, sex slavery, deterrence, and retaliation on their professional standing, schooling and employment prospects, visa status, and physical safety. Instead, UNR had a regular practice of discrediting, retaliating, and dismissing foreign employees who raised concerns about its abusive and hostile environment. This environment made Fan afraid to disclose the abuse until her EB-1A visa was approved. UNR's retaliatory actions dissuaded Fan from reporting the abuse until Fan's tenure was recommended to the Board of Regents.

   c. Since 2006, Jiang, in his official capacity, raped, sexually slaved, threatened, and retaliated against Fan based on Fan's gender, creating a hostile environment for Fan. In 2020, after Jiang learned that Fan disclosed the sexual acts, Jiang plotted to deport Fan from the U.S. and expel Fan from UNR and academia.

d. After Fan filed formal Title IX complaints since 2021 January, UNR intentionally discredited Fan and disparaged Fan's professional standing and reputation by imposing interim measures that stacked against Fan.

e. UNR intentionally dragged the investigation process out and never made visible progress in its sham investigation of Jiang's sexual misconduct, defamation, deterrence, and retaliation, even though UNR had Jiang's own testimony under oath that he had sexual acts with Fan when he was Fan's advisor and mentor and had an authority to vote on Fan's tenure-or-not.

f. After Fan filed formal complaints, UNR took no apparent steps to stop powerful and influential perpetrators, including Jiang, from following through on their abuse, threats, and retaliation, or targeting vulnerable students and faculty.

195.    Instead of stopping discrimination and the abusive and hostile environment, UNR perpetrated it and exacerbated the original harm, subjecting Fan to additional trauma and left Fan more vulnerable to retaliation at the hands of Jiang and his allies.

196.    UNR's long-standing failures in many aspects created a hostile environment for Fan and has harmed and continues to harm Fan. UNR's failures to prevent and redress Jiang's abuse and retaliation have profoundly ruined Fan's career prospects and future employment opportunities in academia. UNR facilitated Jiang to force Fan to leave academia, derailing Fan's academic trajectory and wasting years of Fan's life and dedicated work. As a result of the abuse she endured at UNR, Fan suffered severe physical, mental, emotional, financial, reputational, and professional harm, which will continue for the foreseeable future.

197.    Because of the continuous nature of UNR's unlawful conduct, Fan is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

198.    Because a reasonable person in Fan's position would have first discovered that UNR's unlawful practices and handling of prior complaints against senior faculty in the ME department were the probable cause of her injury within the applicable limitations period, Fan is entitled to the application of the discovery rule to the unlawful acts alleged herein.

199.    Because Jiang, in his official capacity, and Gordaninejad, retired but still influential, threatened Fan's physical safety, visa status, employment, and career if Fan spoke out about Jiang's misconduct, because Jiang plotted to deport Fan from the U.S. and dismiss Fan from UNR, because

UNR ratified those threats by failing to act on the threats and ignoring Fan's requests to report her concerns to administrators up the chain of command, and because those threats induced Fan to keep silent about Jiang's misconduct until 2021 January, equity estops UNR from relying on the statute of limitations.

200.    Accrual under federal common law occurs and the prescriptive period begins to run the moment a plaintiff becomes aware that he/she has suffered an injury. *McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019). A plaintiff's awareness encompasses two elements: (1) The existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions. *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001). Thus, a plaintiff needs to have an awareness of the facts that would ultimately support the claim.

201.    Only through Fan's own recent investigation and the resulting fallout of UNR's longstanding complicity with the ME senior leadership, was Fan able to know that (1) UNR created, ratified, and/or engaged in the discrimination, hostile work environment, deterrence, and retaliation; and (2) that there was a direct causal connection between UNR's continued failures to act and the discrimination, hostile work environment, deterrence, and retaliation Fan experienced.

202.    Fan is entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorney's fees and costs, and other appropriate relief.

203. As a direct and proximate result of the actions of UNR detailed in this complaint, Fan has suffered severe physical, mental, emotional, financial, reputational, and professional harm, and the harm continues.

204.    Fan has suffered, and continues to suffer, damages in an amount to be proven at trial, including attorney's fees, injunctive relief, and other relief that the Court may deem proper.

<u>COUNT VII</u>

<u>RETALIATION IN VIOLATION OF TITLE IX 20 U.S.C. § 1681</u>

205.    Fan realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

206.    Fan alleges violations of Title IX against UNR due to its retaliation, in addition to deliberate indifference, discrimination, and hostile work environment.

207.    UNR has subjected Fan to retaliation that was sufficiently severe, pervasive, and objectively offensive to interfere with her life. The consequences have been devastating: Jiang and his enabler, UNR, destroyed her professional standing, future employment opportunities, and career. UNR deprived her of a normal work environment and the benefits of her employment contracts. Relevant actions include, but are not limited to:

a. In 2020, after Jiang learned that Fan disclosed the sexual acts, Jiang plotted to deport Fan from the U.S. and expel Fan from UNR and academia.

b. After Fan filed formal Title IX complaints in 2021 January, UNR intentionally discredited Fan and disparaged Fan's professional standing and reputation by imposing interim measures that stacked against Fan.

c. UNR intentionally dragged the investigation process out and never made visible progress in its sham investigation of Jiang's sexual abuse, defamation, deterrence, and retaliation, even though UNR had Jiang's own testimony under oath that he had sexual acts with Fan when he was Fan's advisor and mentor, and served on the tenure committee that evaluated and voted on Fan's tenure-or-not.

d. After Fan filed formal complaints, UNR took no apparent steps to stop powerful and influential perpetrators, including Jiang, from following through on their abuse, threats, and retaliation, or targeting vulnerable students and faculty.

208.    Even before Jiang and his allies took retaliatory actions, UNR's senior faculty and administrators with supervisory authority to implement corrective measures knew the longstanding abusive culture within the ME department. UNR also knew that its policies, customs, and practices unreasonably exposed foreign employees to retaliation. UNR was further aware that the deterrence and retaliation perpetrated by powerful and influential senior faculty continued to chill vulnerable employees' opposition to the abusive culture and the hostile environment within the ME department. However, UNR's retaliatory actions dissuaded foreign employees, including Fan, from making or supporting formal complaints, leaving Fan even more vulnerable.

209.    Instead of stopping discrimination and the hostile environment, UNR retaliated against Fan, as it did to other foreign employees, to protect its own reputation, monetary and other benefits, subjecting Fan to additional trauma.

210.     UNR's longstanding failures in many aspects created a hostile environment for Fan and has harmed and continues to harm Fan. UNR's failures to prevent and redress Jiang's abuse and retaliation have profoundly ruined Fan's professional standing, career prospects, and future employment opportunities. UNR facilitated Jiang to force Fan to leave academia, derailing Fan's academic trajectory and wasting years of Fan's life and dedicated work. As a result of the abuse she endured at UNR, Fan suffered severe physical, mental, emotional, financial, reputational, and professional harm, which will continue for the foreseeable future.

211.     Because of the continuous nature of UNR's unlawful conduct, Fan is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

212.     Because a reasonable person in Fan's position would have first discovered that UNR's unlawful practices and handling of prior complaints against senior faculty in the ME department were the probable cause of her injury within the applicable limitations period, Fan is entitled to the application of the discovery rule to the unlawful acts alleged herein.

213.     Because Jiang, in his official capacity, and Gordaninejad, retired but still influential, threatened Fan's physical safety, visa status, employment, and career if Fan spoke out about Jiang's misconduct, because Jiang plotted to deport Fan from the U.S. and dismiss Fan from UNR, because UNR ratified those threats by failing to act on the threats and ignoring Fan's requests to report to administrators up the chain of command, and because those threats induced Fan to keep silent about Jiang's misconduct until 2021 January, equity estops UNR from relying on the statute of limitations.

214.     Accrual under federal common law occurs and the prescriptive period begins to run the moment a plaintiff becomes aware that he/she has suffered an injury. *McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019). A plaintiff's awareness encompasses two elements: (1) The existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions. *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001). Thus, a plaintiff needs to have an awareness of the facts that would ultimately support the claim.

215.     Only through Fan's own recent investigation and the resulting fallout of UNR's longstanding complicity with the ME senior leadership, was Fan able to know that (1) UNR created, ratified, and/or engaged in the discrimination, hostile work environment, and retaliation; and (2) that there was a direct causal connection between UNR's continued failures to act and the discrimination, hostile work environment, deterrence, and retaliation Fan experienced.

216.    Fan is entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorney's fees and costs, and other appropriate relief.

217. As a direct and proximate result of the actions of UNR detailed in this complaint, Fan has suffered severe physical, mental, emotional, financial, reputational, and professional harm, and the harm continues.

218.    Fan has suffered, and continues to suffer, damages in an amount to be proven at trial, including attorney's fees, injunctive relief, and other relief that the Court may deem proper.

COUNT VIII

NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF TITLE VI 42 U.S.C. § 2000d

219.    Fan realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

220.    Fan alleges violations of Title VI against UNR due to its discrimination on Fan's national origin and visa status.

221.    Under Title VI, 42 U.S.C. § 2000d, *et seq.*, no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

222.    UNR has subjected Fan to discrimination based on her national origin and visa status, including sex slavery, forced labor, deterrence, retaliation, and deliberate indifference to a hostile environment that was sufficiently severe, pervasive, and objectively offensive to interfere with her life. The consequences have been devastating for Fan: Jiang and his enabler, UNR, ruined Fan's professional standing, employment opportunities, and career; Jiang, in his official capacity, has almost destroyed her life. UNR deprived Fan of the benefits of her employment contracts. Relevant actions include, but are not limited to:

a. For at least over a decade, UNR did not take measures to protect foreign students or employees, including Fan, from unlawful labor exploitation, sex slavery, sexual assault and harassment, sexual abuse, deterrence, and retaliation on their professional standing, schooling and employment prospects, visa status, and physical safety. Instead, UNR ordinarily discredited, deterred, retaliated against, and dismissed foreign employees who raised concerns about its abusive and hostile environment. This environment made

Fan afraid to disclose the abuse until her EB-1A visa was approved. UNR's actions dissuaded Fan from reporting the abuse until Fan's tenure was recommended to the Board of Regents.

b. Since 2006, Jiang, in his official capacity, intentionally targeted, raped, sexually slaved, threatened, and retaliated against Fan, creating a hostile environment. In 2020, after Jiang learned that Fan disclosed the sexual acts, Jiang plotted to deport Fan from the U.S. and expel Fan from UNR and academia.

c. After Fan filed formal Title IX complaints in 2021 January, UNR intentionally discredited Fan and disparaged Fan's professional standing and reputation by imposing interim measures that stacked against Fan.

d. UNR intentionally dragged the investigation process out and never made visible progress in its sham investigation of Jiang's sexual misconduct, defamation, and retaliation, even though UNR had Jiang's own testimony under oath that he had sexual acts with Fan when he was Fan's advisor and mentor, and served on the tenure committee that voted on Fan's tenure-or-not.

e. After Fan filed formal complaints, UNR took no apparent steps to stop powerful and influential perpetrators, including Jiang, from following through on their abuse, threats, and retaliation, or targeting vulnerable employees, including Fan.

223.   UNR treated its American employees better by not subjecting them to sex slavery, unlawful forced labor, deliberate indifference to discrimination, retaliation, defamation, and a hostile environment. For over a decade, UNR maintained its institutional corruption, customs, practices, and/or official procedures based on bias against foreign employees who relied on F-1, H-1B, and EB-1 visas, and in favor of powerful and influential senior employees who were U.S. citizens. UNR's disparate treatment of Fan is a direct and proximate result of national origin discrimination.

224.   UNR's long-standing failures in many aspects created a hostile environment for Fan and has harmed and continues to harm Fan. UNR's failures to prevent and redress Jiang's abuse and retaliation have profoundly altered the academic trajectories and career prospects of Fan. UNR facilitated Jiang to force Fan to leave academia, derailing Fan's academic trajectory and wasting years of Fan's life and dedicated work. As a result of the abuse she endured at UNR, Fan suffered severe physical, mental, emotional, financial, reputational, and professional harm, which will continue for the foreseeable future.

225.    Because of the continuous nature of UNR's unlawful conduct, Fan is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

226.    Because a reasonable person in Fan's position would have first discovered that UNR's unlawful practices and handling of prior complaints against senior faculty in the ME department were the probable cause of her injury within the applicable limitations period, Fan is entitled to the application of the discovery rule to the unlawful acts alleged herein.

227.    Because Jiang, in his official capacity, and Gordaninejad, retired but still influential, threatened Fan's physical safety, visa status, employment, and career if Fan spoke out about Jiang's misconduct, because Jiang plotted to deport Fan from the U.S. and dismiss Fan from UNR, because UNR ratified those threats by failing to act on the threats and ignoring Fan's requests to report her concerns to administrators up the chain of command, and because those threats induced Fan to keep silent about Jiang's misconduct until 2021 January, equity estops UNR from relying on the statute of limitations.

228.    Accrual under federal common law occurs and the prescriptive period begins to run the moment a plaintiff becomes aware that he/she has suffered an injury. *McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019). A plaintiff's awareness encompasses two elements: (1) The existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions. *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001). Thus, a plaintiff needs to have an awareness of the facts that would ultimately support the claim.

229.    Only through Fan's own recent investigation and the resulting fallout of UNR's longstanding complicity with the ME senior leadership, was Fan able to know that (1) UNR created, ratified, and/or engaged in the discrimination, hostile work environment, and retaliation; and (2) that there was a direct causal connection between UNR's continued failures to act and the discrimination, hostile work environment, deterrence, and retaliation Fan experienced.

230.    Fan is entitled to all legal and equitable remedies available for UNR's violations of Title VI, including compensatory damages, injunctive relief, attorney's fees and costs, and other appropriate relief.

231. As a direct and proximate result of the actions of UNR detailed in this complaint, Fan has suffered severe physical, mental, emotional, financial, reputational, and professional harm, and the harm continues.

232.   Fan has suffered, and continues to suffer, damages in an amount to be proven at trial, including attorney's fees, injunctive relief, and other relief that the Court may deem proper.

COUNT IX

BREACH OF CONTRACT

233.   Fan realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

234.   Fan's employment at UNR was pursuant to a contractual relationship, with the terms and conditions set forth in UNR's catalogs and bulletins, including UNR's Employee Code, Conduct Policy, Code of Conduct, Harassment Policy, Whistleblowing Policy, Non-Retaliation Policy, and Discrimination Policy. UNR was bound to the terms of these contracts. Fan's motivation for entering into the contracts with UNR was to gain educational and professional experience and to contribute to her chosen field of academic study and work.

235.   UNR's contracts forbade discrimination based on race, color, national origin, citizenship status, and promised prompt and effective resolution to alleged or suspected incidents of discrimination. UNR subjected Fan to discrimination on the basis of her race, color, sex, national origin, citizenship status, and visa status, as set forth in the factual allegations above, including sex slavery, forced labor, deterrence, retaliation, defamation, hostile environment, and deliberate indifference.

236.   UNR's contracts forbade "consensual" sexual acts between students and faculty or between tenure-track faculty and tenure committee members who evaluate and vote on tenure-or-not when there existed a "conflict of interest." Due to the inherent conflicts of interest, no individual should initiate or participate in institutional or educational decisions involving a direct benefit or penalty to a person with whom that individual has or has had sexual acts. Jiang, as Fan's academic advisor, mentor, and tenure committee member, sexually slaved, raped, deterred, and retaliated against Fan, creating a conflict of interest in violation of this policy.

237.   UNR required that all employees report allegations of or disclosures of sexual violence or sexual misconduct to the Title IX Coordinator. However, for decades, until now, foreign student employees, including research assistants, teaching assistants, and student lecturers, received no training, encouragement or explanation that qualified them to make these reports. Junior faculty in the ME department received little training that qualified them to make reports and identify deterrence and

retaliation. Senior faculty received little or no supervision that qualified them in a leadership role without abusing their power and authority, so that they were allowed to act with impunity for at least over a decade. Being aware of the vulnerabilities of foreign employees, UNR intentionally employed procedures and investigation processes stacked against foerign employees to deter any disclosures on its hostile environment. All these longstanding failures allowed Jiang's abuse and the toxic culture within its ME department to flourish.

238.    Although UNR knew or should have known Jiang repeatedly abused his power and authority to sexually slave and unlawfully exploit his subordinates, UNR took no effective action against Jiang. UNR dragged its sham investigation of Jiang for over one and a half years with no visible progress, against the terms of its contracts with Fan, leaving Fan vulnerable to retaliation and anxious about her physical safety and professional standing. When breaching the contracts and mishandling its obligations to Fan, UNR took advantage of its superior position and Fan's inferior position.

239.    As a result of UNR's contractual breaches with Fan, Fan suffered severe physical, mental, psychological, emotional, reputational, professional and monetary harm. The harm is continuing in nature and will continue to accrue until resolution by the Court. The breaches ruined Fan's entire experience at UNR and have destroyed her life since she was 23.

240.    Fan suffered damages and injuries for which UNR is liable under state law.

241.    As a direct and proximate result of the actions of UNR detailed in this complaint, Fan has suffered severe physical, mental, emotional, financial, reputational, and professional harm, and the harm continues.

242.    Fan has suffered, and continues to suffer, damages in an amount to be proven at trial, including attorney's fees, injunctive relief, and other relief that the Court may deem proper.

<u>COUNT X</u>

<u>NEGLIGENT, GROSSLY NEGLIGENT, OR RECKLESS TRAINING, SUPERVISION, AND RETENTION</u>

243.    Fan realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

244.    Upon information and belief, at all times relevant to this action, Jiang was an agent of and employed by UNR.

245.    UNR owed Fan a duty of care to take reasonable protective measures to protect Fan from sex slavery, sexual assault, sexual harassment, deterrence, and retaliation by Jiang and his allies.

246.    UNR breached its duty in its training, supervision, and retention of Jiang. UNR knew, or should have known, Jiang's past sexual misconduct before he was hired by UNR. UNR knew, or in the exercise of reasonable care should have known, that Jiang posed a risk to and was unfit to work with, exercise influence over, or supervise female students and junior faculty who were vulnerable at least because of their visa status. However, UNR failed to exercise due care in retaining Jiang, a serial sexual predator, in a position of access, influence, and authority over female students and junior faculty without adequate training or supervision. UNR is also vicariously liable for all conduct of Jiang and for all damages which it could have prevented to Fan.

247.    UNR required that all employees report allegations of, or disclosures of, sexual violence or sexual misconduct to the Title IX Coordinator. However, for decades, until now, foreign student employees in the ME department, including research assistants, teaching assistants, and student lecturers, received no training, encouragement or explanation that qualified them to make these reports. Junior faculty in the ME department received little training that qualified them to make reports and identify deterrence and retaliation. Senior faculty received little or no supervision that qualified them in a leadership role without abusing their power and authority, so that they were allowed to act with impunity for at least over a decade. All these longstanding failures allowed Jiang's abuse and the toxic culture within its ME department to flourish.

248.    As a direct and proximate result of UNR's breach of its duty in training, supervision, and retention, UNR subjected Fan to sex slave, sexual assault and harassment, deterrence, retaliation, and a hostile environment. Fan suffered severe physical, mental, psychological, emotional, reputational, professional and monetary harm. The harm is continuing in nature and will continue to accrue until resolution by the Court. The breaches ruined Fan's entire experience at UNR and have destroyed her life since she was 23.

249.    UNR's actions detailed herein show that UNR was grossly negligent in failing in its duty of care towards Fan and other graduate and/or international students. Upon information and believe, UNR's actions rise to the level of reckless indifference to its duty of care towards Fan and other graduate and/or international students.

250.    Fan suffered damages and injuries for which UNR is liable under state law.

251.    As a direct and proximate result of the actions of UNR detailed in this complaint, Fan has suffered severe physical, mental, emotional, financial, reputational, and professional harm, and the harm continues.

252.    Fan has suffered, and continues to suffer, damages in an amount to be proven at trial, including attorney's fees, injunctive relief, and other relief that the Court may deem proper.

COUNT XI

BREACH OF DUTY TO FAN

253.    Fan realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

254.    UNR has a duty of care owed towards Fan because Fan was dependent on UNR for her employment and visa. UNR owed Fan a duty to act in good faith and with due regard for her interests. UNR thus owed Fan a duty of care to create an environment in which she could work free from sex slavery, sexual assault and harassment, deterrence, and retaliation by senior faculty members.

255.    UNR breached the duty it owed to Fan by creating, tolerating, condoning, ratifying, and/or engaging in the hostile environment, gender discrimination, national origin discrimination, deterrence, and retaliation, and failing to take remedial action. UNR failed to carry out its duty to protect Fan from a hostile environment with unwarranted, unwanted, and improper sexual assault and harassment, deterrence, and retaliation. UNR failed to adopt and enforce practices and grievance procedures to effectively respond to misconduct. UNR failed to act in good faith and with due regard for Fan's interests. UNR failed to conduct prompt, fair and reasonable investigations into Jiang's sexual misconduct, abuse, deterrence, and retaliation.

256.    UNR breached its duty in its training, supervision, and retention of Jiang, who had supervisory authority over Fan. UNR knew, or in the exercise of reasonable care should have known, that Jiang was unfit to work with and supervise female students and junior faculty who relied on F-1 and H-1B visas.

257.    UNR knew or should have known that it fostered a hostile environment that enabled Jiang to sexually abuse, deter, and retaliate against Fan. UNR knew or should have known that the ME senior leadership had a propensity for abusing, unlawfully exploiting, discriminating and retaliating foreign students and junior faculty.

258.     As a direct and proximate result of UNR's breach of its duty of care owed to Fan, UNR subjected Fan to sex slave, sexual assault and harassment, deterrence, retaliation, defamation, and a hostile environment. Fan suffered severe physical, mental, psychological, emotional, reputational, professional and monetary harm. The harm is continuing in nature and will continue to accrue until resolution by the Court. The breaches ruined Fan's entire experience at UNR and have destroyed her life since she was 23.

259.     Fan has suffered damages and injuries and continues to suffer damages and injuries for which UNR is liable under state law.

260.     As a direct and proximate result of the actions of UNR detailed in this complaint, Fan has suffered severe physical, mental, emotional, financial, reputational, and professional harm, and the harm continues.

261.     Fan has suffered, and continues to suffer, damages in an amount to be proven at trial, including attorney's fees, injunctive relief, and other relief that the Court may deem proper.

<u>COUNT XII</u>

<u>TORTIOUS-INTERFERENCE OF CONTRACT</u>

262.     Fan realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

263.     Fan's employment at UNR was pursuant to a contractual relationship, with the terms and conditions set forth in UNR's catalogs and bulletins, including UNR's Employee Code, Conduct Policy, Code of Conduct, Harassment Policy, Whistleblowing Policy, Non-Retaliation Policy, and Discrimination Policy. UNR was bound to the terms of these contracts and was fully aware of the terms of the contract because UNR was the drafter of the contract. Fan's motivation for entering into the contracts with UNR was to gain educational and professional experience and to contribute to her chosen field of academic study and work.

264.     UNR's contracts forbade discrimination based on race, color, national origin, citizenship status, and promised prompt and effective resolution to alleged or suspected incidents of discrimination. UNR took intentional acts to disrupt the contract when UNR subjected Fan to discrimination on the basis of her race, color, sex, national origin, citizenship status, and visa status, as set forth in the factual allegations above, including sex slavery, forced labor, deterrence, retaliation, defamation, hostile environment, and deliberate indifference.

265.     UNR's contracts forbade "consensual" sexual acts between students and faculty or between tenure-track faculty and tenure committee members who evaluate and vote on tenure-or-not when there existed a "conflict of interest." Due to the inherent conflicts of interest, no individual should initiate or participate in institutional or educational decisions involving a direct benefit or penalty to a person with whom that individual has or has had sexual acts. Jiang, as Fan's academic advisor, mentor, and tenure committee member, sexually slaved, raped, deterred, and retaliated against Fan, disrupting the contract between UNR and Fan and causing injuries to Fan.

266.     UNR required that all employees report allegations of or disclosures of sexual violence or sexual misconduct to the Title IX Coordinator. However, for decades, until now, foreign student employees, including research assistants, teaching assistants, and student lecturers, received no training, encouragement or explanation that qualified them to make these reports. Junior faculty in the ME department received little training that qualified them to make reports and identify deterrence and retaliation. Senior faculty received little or no supervision that qualified them in a leadership role without abusing their power and authority, so that they were allowed to act with impunity for at least over a decade. Being aware of the vulnerabilities of foreign employees, UNR intentionally employed procedures and investigation processes stacked against foreign employees to deter any disclosures on its hostile environment. All these longstanding failures were intentional acts to disrupt the contract between UNR and Fan by allowing Jiang's abuse and the toxic culture within its ME department to flourish.

267.     Although UNR knew or should have known Jiang repeatedly abused his power and authority to sexually slave and unlawfully exploit his subordinates, UNR took no effective action against Jiang. UNR dragged its sham investigation of Jiang for over one and a half years with no visible progress, against the terms of its contracts with Fan, leaving Fan vulnerable to retaliation and anxious about her physical safety and professional standing. UNR took advantage of its superior position and Fan's inferior position to intentionally disrupt the contract between UNR and Fan.

268.     As a result of UNR's contractual disruption with Fan, Fan suffered severe physical, mental, psychological, emotional, reputational, professional and monetary harm. The harm is continuing in nature and will continue to accrue until resolution by the Court. The disruption of the contract ruined Fan's entire experience at UNR and have destroyed her life since she was 23.

269.     Fan suffered damages and injuries for which UNR is liable under state law.

270.     As a direct and proximate result of the actions of UNR detailed in this complaint, Fan has suffered severe physical, mental, emotional, financial, reputational, and professional harm, and the harm continues.

271.     Fan has suffered, and continues to suffer, damages in an amount to be proven at trial, including attorney's fees, injunctive relief, and other relief that the Court may deem proper.

EQUITABLE ESTOPPEL.

272.     Fan realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

273.     Through information and belief, UNR has practiced, and continues to practice, a persistent course of conduct through the UNR Title IX office and other administrators of taking active steps to intentionally mislead, deter, and delay those persons who file Title IX complaints with an end goal of avoiding legal action by intending to prevent and/or deter Title IX complainants (such as Fan and other similarly situated complainants including students, faculty, and staff) from bring suit before the statue of limitations expires.

274.     UNR's intentional conduct in misleading, deterring, and delaying Title IX complainants so that they fail to file suit before the statute of limitations tolls constitutes a fraudulent concealment of available remedies and therefore principals of equity (in addition to established equitable estoppel caselaw) demand that UNR cannot be allowed to assert as a defense that Plaintiff failed to meet any applicable statute of limitations.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

A.     A declaratory judgment that UNR's policies, practices, and/or procedures challenged herein are illegal and in violation of the rights of Plaintiff under the TVPRA, Title IX, Title VI, and the applicable Nevada state laws and doctrines set forth above;

B.     A permanent injunction against UNR and its officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, and usages as set forth herein;

C.      A permanent injunction requiring external audits of UNR's compliance with Title IX and Title VI;

D.      An Order requiring UNR to initiate an independent investigation of its past deviation from Title IX and Title VI responsibilities within its ME department;

E.      An award of damages to Plaintiff, including compensatory damages and punitive damages, in an amount to be determined at trial not less than $20,000,000;

F.      An award of litigation costs and expenses, including reasonable attorney's fees and expenses;

G.      An award of pre-judgment and post-judgment interest available under law; and

H.      Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues triable of right to a jury.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: *Jan 27, 2023*                              *Feifei Fan*

Fei Fei Fan, Plaintiff

DATED this 27nd day of January, 2023.

_/s/ Ryan J. Cann_____
Ryan J. Cann, Esq.
Nevada Bar No. 11073
CANN IP LAW PLLC
1 East Liberty Street, Suite 600
Reno, Nevada 89501
775-234-3796  Telephone
info@canniplaw.com  Email
Attorney for Plaintiff